UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMARAL MONTROND, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| LUIS SPENCER, MICHAEL THOMPSON, | * |
| JAMES GALLAGHER, DALE | * |
| BISSONETTE, PAUL LETENDRE, | * |
| JONATHAN HEALEY, FREDERICK | * |
| LOUGHRAN, JONATHAN MACAL, KYLE | * |
| FITZPATRICK, RICHARD HASBROUK, | * |
| MICHAEL DONAHUE, JEREMY | * |
| BRESSLER, MICHAEL RICKETTS, | * |
| MICHELA PAONE-STUART, CHARLES | *    Civil Action No. 17-cv-10505-ADB |
| HESLIN, JAMES BAIROS, BRIAN BIBEAU, | * |
| SHAWN LOUGHRAN, MARK | * |
| WAITKEVICH, THOMAS MERLINO, | * |
| NICHOLAS BULL, MICHAEL CHAPLAIN, | * |
| BRANDON WALBURN, JOSHUA RYAN, | * |
| DENNY SANTOS, DEREK GIASANTI, | * |
| JOSE CID, BRIAN GONZALEZ, EDWARD | * |
| MORRIS, CARRIE EARLE, KRISTI | * |
| SALVATELLI, ALLISON TARDY, SARAH | * |
| BIRABWA, ALLISON [LAST NAME | * |
| UNKNOWN], and JANE DOE, | * |
| | * |
| Defendants. | * |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

     Plaintiff Amaral Montrond ("Plaintiff" or "Montrond") initiated this action seeking

monetary damages from Defendants, current and former employees of the Massachusetts

Department of Corrections ("DOC"), in connection with alleged physical assaults and inadequate

medical care while he was incarcerated at the Massachusetts Correctional Institution at Concord

("MCI-Concord").  [ECF No. 125 ¶ 2].  Currently before the Court is Defendants Brian Bibeau,

Jeremy Bressler, Nicholas Bull, Michael Chaplin, Jose Cid, Michael Donahue, Kyle Fitzpatrick, Derek Giansanti, Brandon Gonzalez, Johnathan Healey, Paul Letendre, Frederick Loughran ("F. Loughran"), Shawn Loughran ("S. Loughran"), Jonathan Macal, Thomas Merlino, Michela Paone-Stuart, Michael Ricketts, Joshua Ryan, Denny Santos, and Brandon Wilburn's (collectively, "DOC Defendants") motion for summary judgment.  [ECF No. 320].[1]  For the reasons stated below, the DOC Defendants' motion is <u>GRANTED</u> in part and <u>DENIED</u> in part.

## I.      BACKGROUND

### A.      Procedural History

On February 5, 2019, upon reassignment of this action to the undersigned, Montrond's Second Amended Complaint, [ECF No. 125 ("SAC")], was docketed per the Court's February 5, 2019 Order, [ECF No. 124].  The Second Amended Complaint asserted nine counts: Counts I–VII allege violations of Montrond's Eighth Amendment rights and the Massachusetts Declaration of Rights Article XXVI ("Article 26") under 42 U.S.C. § 1983,[2] Count VIII claims

---

[1] Regarding the remaining named Defendants, the DOC Defendants contend, and Plaintiff does not dispute, that the following individuals are no longer part of the case: Charles Heslin, Richard Hasbrouck, and Mark Waitkevich, [ECF No. 323 at 2]; <u>see also</u> [ECF No. 168 at 32 (dismissing Claim I as to Heslin and Hasbrouck, which, as discussed below, <u>supra</u>, is the only claim that implicated them); ECF No. 252 (Waitkevich)].  In addition, Sarah Birabwa, Carrie Earle, Edward Morris, Allison Tardy, Kristi Salvatelli, MPCH-Services, Inc., and Massachusetts Partnership of Correctional Healthcare are no longer in the case.  [February 5, 2019 unnumbered docket entry (MPCH-Services, Inc.); ECF No. 325 (Morris, Salvatelli, Allison (Tardy), Birabwa, Earle); ECF No 329 (Massachusetts Partnership of Correctional Healthcare)].  Further, Defendant Gallagher has not been served and, given the passage of time, the Court concludes that he is also no longer in the case.  [ECF No. 337 at 2].  Finally, Plaintiff has indicated that it is no longer asserting claims against Luis Spencer, Michael Thompson, Dale Bissonnette, and James Bairos, [ECF No. 337-2], who are accordingly <u>DISMISSED</u> from this action.

[2] Counts I–VII bring claims under 42 U.S.C. § 1983 with respect to events that occurred on the following dates and involving the following individuals against whom claims remain pending: Count I, March 13, 2014, involving Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal, Fitzpatrick, Bressler, Paone-Stuart, and Donahue, [SAC ¶¶ 131–136]; Count II, March 25, 2014, involving Bull, [<u>id.</u> ¶ 137–138]; Count III, July 15, 2014, involving Ryan, Santos, Merlino, Bull,

Assault and Battery,[3] and Count IX asserts the Intentional Infliction of Emotional Distress.[4] [SAC ¶¶ 131–163].

On February 4, 2020, the Court dismissed Count I as to Fitzpatrick for actions taken after a March 13, 2014 alleged assault, [ECF No. 168 at 22–23], and Count II as to Bull, who was the only defendant against whom Count II was brought.  [Id. at 32].  Moreover, the Court granted the DOC Defendants' motion to dismiss Counts IV, V, and VI to the extent that recovery was premised "solely on violation of the cited [Massachusetts] policies and regulations," [id. at 28–29], or in other words, to the extent that Montrond sought monetary damages based solely on violations of Massachusetts regulations, [id. at 32–33].

Accordingly, the following claims remain against the following DOC Defendants, all of which are the subject of this motion for summary judgment:

- Count I (March 13, 2014): Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal, Fitzpatrick, Bressler, Paone-Stuart, and Donahue.  [SAC ¶¶ 131–136].

- Count III (July 15, 2014): Ryan, Santos, Merlino, Bull, Cid, and Giansanti.  [Id. ¶¶ 140–142].

- Count IV (August 1 to 5, 2014): Chaplin, Merlino, and Bull.  [Id. ¶¶ 146–147].

- Count V (August 11, 2014): Walburn.  [Id. ¶¶ 149–150].

---

Cid, and Giansanti, [id. ¶¶ 140–142]; Count IV, August 1 to 5, 2014, involving Chaplin, Merlino, and Bull, [id. ¶¶ 146–147]; Count V, August 11, 2014, involving Walburn, [id. ¶¶ 149–150]; Count VI, July and August 2014, involving Chaplin, Bull, Walburn, Bibeau, and S. Loughran, [id. ¶¶ 151–153]; and Count VII, July 26 to 30, 2014, involving Bibeau, [id. ¶¶ 154–155].

[3] Plaintiff's Assault and Battery claim is brought against Letendre, Gonzalez, Healey, F. Loughran, Fitzpatrick, Macal, and Rickets (March 13, 2014), [SAC ¶ 158]; Ryan, Santos, Merlino, and Bull (July 15, 2014), [id. ¶ 159]; Chaplin, Merlino, and Bull (August 5, 2014), [id. ¶ 160]; and Walburn (August 11, 2014), [id. ¶ 161].

[4] Plaintiff is no longer pursuing his intentional infliction of emotional distress claim, [ECF No. 337-2 at 2], and it is therefore DISMISSED.

- Count VI (July and August 2014): Chaplin, Bull, Walburn, Bibeau, and S. Loughran.  [Id. ¶¶ 151–153].

- Count VII (July 26 to 30, 2014): Bibeau.  [Id. ¶¶ 154–155].

- Count VIII (Assault and Battery): Letendre, Gonzalez, Healey, F. Loughran, Fitzpatrick, Macal, Rickets, Ryan, Santos, Merlino, Bull, Chaplin, and Walburn. [Id. ¶¶ 158–161].

**B.   Background Facts**

Except as otherwise noted, the following facts are not in dispute.[5]

Montrond is an inmate in the custody of the DOC.  [SOF ¶ 1].  The events relevant to Montrond's claims occurred between March 2014 and August 2014 while he was incarcerated at MCI-Concord, see [id. ¶ 2], and include the following incidents.

1.   March 13, 2014 (Counts I and VIII)

Counts I and VIII allege that on March 13, 2014, there was a "spontaneous Use of Force" ("SUOF") involving Montrond, and Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal, Bressler, Paone-Stuart, and Donahue.  [SOF ¶ 22; SAC ¶¶ 131–136].  In a video of the incident that is without sound, [ECF No. 337-26 (video provided in native format)], Montrond is seen entering an office that is not easily visible on the camera.  See [id. at 2:31 PM].  Two individuals are outside the office, presumably DOC Defendants Paone-Stuart and Bressler.  See

---

[5] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts, which is Amaral Montrond's Response to DOC Defendants' Statement of Undisputed Material Facts, [ECF No. 337 ("SOF")], and documents referenced therein, as well as the DOC Defendants' Supplemental Statement of Undisputed Material Facts, [ECF No. 342 ("Reply SOF")], and documents referenced therein.  The Court refers to each "Statement" and "Response" as a combined paragraph number.  For example, on page 1 of the SOF, the Court refers to Statement 1 and Response 1 collectively as "¶ 1."

In addition, the numbering of the responses is off by 1 beginning at Statement 66.  The Court refers to the statement number as the paragraph number for both the statement and response thereafter.  For example, a citation to "¶ 66" refers to Statement 66 and Response 65, which for reference appear on page 16 of the SOF.

4

[ECF No. 336 at 11–12]; see also [ECF No. 337-26 at 2:31 PM].  Montrond argues that shortly after they enter the office, "[m]ovement in the Office is visible," and "[t]his is when the physical confrontation occurs."  [ECF No. 336 at 10]; see also [ECF No. 337-26 at 2:31 PM].  The camera quality and image are not sufficient to determine whether and how much force was used.  See [ECF No. 337-26 at 2:31 PM].  Then, at 2:32 PM, officers are seen entering the office, and at 2:34 PM, it appears that Montrond is escorted from the office by multiple officers.  See [id.].

The incident was investigated by Michael Grant, Acting Deputy Commissioner in the Administrative Services Division.  [ECF No. 337-3 at 2].  The "Description of Issue" section of the investigative report states that, at approximately 2:30 PM, the following occurred:

> . . . Montrond was called to the office by LETENDRE to go bring the laundry cart back to C-Building[].  Montrond entered the office, turned towards LETENDRE with his hands concealed under his jacket that he was carrying in his arms.  Montrond replied to LETENDRE "*Do you have a fucking problem?*"  LETENDRE ordered Montro[n]d to drop his jacket and place his hands on the counter so that he could see them.  Montrond did not comply and turned aggressively towards LETENDRE and stated "*You're lucky I don't punch you in the face right now, bitch*."  At that time LETENDRE placed both arms around Montrond's upper torso and brought him to the ground.  Emergency response was activated and Montrond was restrained and escorted to the [Health Services Unit ("HSU")] by C.O. Charles Heslin and Lt. Kyle Fitzpatrick then to the SMU by Lt. Richard Hasbrouck and Fitzpatrick.  Montrond remained combative throughout the entire escort.

[Id. at 5]; see also [SOF ¶ 21 (defining HSU)].  The investigation found that "allegations made by Montrond against Letendre are not sustained."  [ECF No. 337-3 at 62]; see also [SOF ¶ 23].  Specifically, the report stated that

> the allegations Montrond made of being assaulted by LETENDRE, responding staff, and GONZALEZ are UNFOUNDED.  This finding is supported by the self admission by Montrond that he was angry with staff prior to the SUOF and the refusal of direct orders documented by LETENDRE, inconsistent injuries based on his allegations of being assaulted and the guilty finding of his disciplinary report by the CIDU.  Furthermore, based on preponderance of the evidence, LETENDRE did initiate a SUOF on Montrond that was in compliance with the Department of Correction 505 Use of Force Policy by bringing Montrond to the floor when he perceived threat.

[ECF No. 337-3 at 54–55].  Montrond disputes the investigation's findings, see [ECF No. 336 at 12–13], and argues that the force occurred because Montrond refused to return a luggage cart to its proper place, [id. at 8–11], and Letendre "was annoyed at Montrond's dilatoriness and perceived non-compliance and decided in advance to rough him up to impose discipline," [id. at 13–14].

The investigation also found that there were "numerous policy violations against other staff for their failure to write reports relating to this incident and failing to include specific information in existing reports that were submitted."  [ECF No. 337-3 at 62]; see also [SOF ¶ 23].  Specifically, the investigation report said that, among other things, DOC Defendant S. Loughran and other officers "had no direct contact with Montrond but did respond and failed to submit incident reports documenting their response."  [ECF No. 337-3 at 55]; see also [SOF ¶ 23].  In addition, the report found that DOC Defendant Paone-Stuart failed to timely file a report about the incident and was "less than truthful" when asked why she did not submit the report on time.  [ECF No. 337-3 at 57–59]; see also [SOF ¶ 23].

After the incident, at around 2:40 PM, Montrond was seen by medical staff and then brought to the Special Management Unit ("SMU") for housing.  [SOF ¶¶ 25–26; ECF No. 321-5 at 70].  At approximately 3:15 PM, he was seen for treatment, and the nurse who saw him wrote "[r]ight eyebrow with swelling and several scattered small scratches."  [SOF ¶ 26; ECF No. 321-5 at 71].  Also, while he was in the HSU being examined by medical staff, Montrond alleges that he was punched by DOC Defendant Gonzalez, [SOF ¶ 21]; see also [ECF No. 337-3 at 52], which he alleges caused headaches, [SOF ¶ 42].  At his deposition, Montrond testified that "his injuries from the March 13, 2014 [incident include] 'head injuries, mental/emotional injuries, [] scratch and bump bruises to my head, face, under my left eye, [and] eyebrow."  [Id. ¶ 24].  He

further testified that he suffered a concussion as a result of the incident, [id. ¶ 28], and still suffers from "migraines," [id. ¶ 27], although this reflects a self-diagnosis as he has not been diagnosed with either by a medical professional, [id. ¶¶ 28–30], or told by a medical professional that his current headaches are related to the March 13, 2014 incident, [id. ¶ 31]. Nevertheless, Montrond continued to seek treatment for headaches, leg pain, and pain under his eye through at least April 4, 2014. [Id. ¶ 32]; see also [ECF Nos. 337-4; 337-11].

Finally, in support of his claims relating to the March 13, 2014 incident, Montrond testified that his witnesses are the individuals "who he names in his Complaint and in discovery." [SOF ¶ 35]. With respect to individual DOC Defendants, "he cannot state specifically which alleged injuries were caused by defendant Frederick Loughran," [id. ¶ 38], "'can't say specifically' what defendant Gonzalez did to him during the Use of Force," [id. ¶ 40], he was injured by Healey "[b]ecuase he used force upon me," [id. ¶ 44], Macal, Ricketts and Fitzpatrick responded to the incident, [id. ¶¶ 45–46, 48], and Donahue, Bressler, and Paone-Stuart failed to intervene but did not assault him, [id. ¶¶ 49–50, 54–55, 57–58].

### 2. July 15, 2014 Use of Force (Counts III and VIII)

Montrond alleges that on July 15, 2014, DOC Defendants Ryan, Santos, Merlino, and Bull subjected him to excessive force and Giansanti and Cid failed to intervene. [SOF ¶¶ 62–63]. The parties agree that there was a "planned Use of Force" involving Montrond on this date, but disagree as to whether the force that was ultimately used was planned or spontaneous. [Id. ¶ 67].

The July 15, 2014 incident is on video. [ECF No. 321-11 (video provided in native format)]. In the video, officers explain that they are moving Montrond from one cell to another and are authorized to use force, up to and including using chemicals. [Id. at 11:27 AM]. The DOC Defendants on the team moving him are identified as Bull, Merlino, Ryan, Santos, and Cid.

7

[Id. at 11:31–11:32 AM, 11:35 AM].  DOC Defendant Giansanti operated the camera.  [SOF ¶ 104].

In the video, Montrond indicates to the DOC Defendants that he would willingly move cells.  [ECF No. 321-11 at 11:29 AM].  Officers proceed to move him from one cell to another, and on several occasions during the moving process, apply some force when Montrond refuses to comply with their orders.  [Id. at 11:42–11:43 AM, 11:47 AM].  During the move Montrond complains of an injury to his wrist and once in the new cell, he complains of a broken leg.  He then is examined in the new cell by a nurse.  [Id. at 11:48–11:49 AM].  The video, which appears to record the move from beginning to end without interruption, shows Montrond being successfully transferred to his new cell, [id. at 11:53 AM], and ends with officers confirming that he resisted at times during the transfer, and that some force was used, [id. at 11:56 AM].  Despite the video appearing to show the entire move, including instances when the DOC Defendants used force, [id. at 11:42–11:43 AM, 11:47 AM], Montrond alleges that Giansanti did not record him being assaulted, [SOF ¶ 106].

As to specific DOC Defendants, Montrond alleges that once in his new cell, Ryan hit him with his shield multiple times and slammed his head into the wall, [SOF ¶¶ 92–93], though there is no indication of such conduct on the video, see [ECF No. 321-11].  He also claims that Santos caused him emotional injuries, anxiety, depression, and distress.  [SOF ¶¶ 99–100].  He does not specifically offer facts regarding Merlino or Bull, [id. ¶¶ 101–102], and says that Cid allegedly stood watch without intervening but did not himself touch or assault Montrond.  [Id. ¶¶ 115–117].

Two investigations of the incident were done, one by an Internal Affairs Unit, and another by the Director of the Special Operations Division.  [SOF ¶ 72].  Though Montrond

disputes their conclusions, the investigations both generally found that officers complied with relevant regulations and that excessive force was not used.  [Id. ¶¶ 72–73].

At his deposition, Montrond testified that he suffered several injuries as a result of the incident, including head injuries, scrapes, headaches, and an injury to his ankle, [SOF ¶ 64]; see also [ECF No. 337-14 (health services progress note indicating, among other things, "evidence of swelling and bruising on the outer foot")], and that he suffers from anxiety, depression, and distress due to the incident, [SOF ¶ 77].  His ankle, which was x-rayed, was not broken.  [Id. ¶ 76].  In addition, a medical note stated that there was no swelling, bruising, or abrasions, but that a nurse was unable to assess his wrist and ankle pain because he was being uncooperative and combative.  [Id. ¶ 74].  Although Montrond admits that the medical note says these things, he denies that he was uncooperative or combative.  [Id.].

### 3.   July 30, 2014 Denial of Crutches (Count VII)

On July 30, 2014, Montrond was being housed in the SMU, [SOF ¶ 142], which was a unit within MCI-Concord for inmates under administrative segregation, protective custody or disciplinary detention, [id. ¶ 143].

At 12:43 PM, he was placed on a Mental Health Watch because he said he was going to take his own life.  [SOF ¶ 144].  Medical staff issued a list of property that he was allowed to have in his cell during the Mental Health Watch.  [Id. ¶ 146].  Although Montrond agrees that he did not have crutches and toilet paper with him in the cell, he disputes whether the list specifically addressed these two items.  [Id. ¶¶ 147, 149].  The Mental Health Watch lasted until August 6, 2014.  [Id. ¶ 151].

During his Mental Health Watch, Montrond was escorted from his cell on several occasions.  [SOF ¶¶ 153–156].  He alleges that on July 30, during one of these moves, Bibeau withheld crutches, and thus medical care.  [Id. ¶¶ 158–160].  Montrond acknowledges that he did

not file a grievance about Bibeau denying him crutches, but disputes that he "did not file any grievances regarding the DOC and medical staff's failure to provide him with crutches." [Id. ¶ 165 (citing ECF No. 337-17 (Appeal of Grievance No. 75187))].

As relevant here, a July 30, 2014 Release of Responsibility form indicates that Montrond refused crutches on that date, [ECF No. 321-5 at 73], but he denies that the form implies that he was offered and then refused crutches. [SOF ¶ 170].

On a Medical/Mental Inmate Grievance Form for Grievance No. 75187, dated August 13, 2014, Montrond stated the following about an incident:

> On or about 8/5/14 and prior, I submitted a few sick call slips regarding my ankle injury, head injuries, and other injuries suffered when I was assaulted by officers. In those slips, I also complained of the fact that I have no medical devices such as ankle bracelet, bandages, or [c]rutches to support and treat my ankle injury. . . . My ankle isnt improving at all. Its still swollen, sensitive, and weak. I need some medical devices for it and [c]rutches for support.

[ECF No. 342-1 at 3]. The health services administrator denied his request for crutches "due to security reasons," and explained that "as an accommodation we had authorized a wheelchair for transportation out of cell, however these accommodations have expired." [Id.].

Defendant appealed on August 20, 2014, stating that

> [t]he decision to my grievance #75187 is stating my medical needs are being met while same time my request for crutches and medical devices are being denied, and accommodation to wheelchair has expired. The decision is completely contrary to my medical needs and requests. I'm incapable of walking a good distance without causing pain or other harm to my ankle injury. The denial to my request for crutches or wheelchair i[s] therefore forcing me to walk on a badly [weak and] injured ankle. My follow up on 8/15/14 to my injuries was scheduled after I filed my grievance . . . . I need crutches or wheelchair to assist me in walking on my injured ankle.

[ECF No. 337-17 at 2]. The appeals grievance coordinator responded with the following:

"[w]hile investigating your appeal, I was informed you were seen on 8/20/14 and 8/27/14 by the NP.  While crutches are not indicated, an order for wheelchair use remains present, if needed, when you come out of your cell.  In addition, I was informed that despite complaining of ankle pain, at times you will refuse motrin as ordered.  Based on your request, this appeal is partially approved, as you have a wheelchair order in place.

[Id.].

### 4.   August 1 Through 5, 2014 Excessive Force (Counts IV and VIII)

With regards to Counts IV and VIII, Montrond alleges that between August 1 and 5, 2014, Chaplin applied "unnecessary twists, squeezes, and excessive force on his wrists and hands, including excessive squeezes on his arms."  [SOF ¶ 208 (internal quotations omitted)].  In addition, he generally alleges that on August 5, 2014, "Chaplin, Merlino, and Bull used excessive force on him."  [Id. ¶ 209].  With regards to this incident, Montrond testified at his deposition that "only Michael Chaplin used excessive force against [him] . . . on August 5, 2014," and that neither Merlino nor Bull "used excessive force" against him on that day.  [Id. ¶¶ 221–223 (internal quotations omitted)].

Montrond did not suffer any physical injuries and did not receive medical treatment for the events between August 1 and 4, 2014 and testified that his injuries were "mental" and "emotional."  [SOF ¶¶ 214, 217].  He further testified that, up to August 5, 2014, "his only injuries were mental, emotional injury, exacerbate[ed] by abusing me."  [Id. ¶ 215 (internal quotations omitted)].  Montrond admits that "[t]here is nothing in [his] medical record that reflects he complained of restraints being applied inappropriately during the time period of August 1 [through] 5, 2014."  [Id. ¶ 216].

With respect to August 5, 2014, Montrond alleges that "Chaplin slammed his head on the ground," [SOF ¶ 224], and that although Merlino and Bull did not use excessive force on him, they and Chaplin did not provide medical attention after the use of force, [id. ¶¶ 222–223, 225].

As a result of the August 5, 2014 use of force, Montrond testified that he experienced headaches and that the events exacerbated an ankle injury.  [Id. ¶¶ 226, 228].

Montrond "did not file a grievance explicitly referencing the use of force on August 5, 2014," but denies that he "did not file a grievance addressing Chaplin's excessive use of force, including those that occurred on August 5, 2014," citing to Grievance No. 75326.  [Id. ¶ 220 (citing ECF No. 337-21)].  In Grievance No. 75326, dated August 15, 2014, Montrond alleged that

> officer Chaplin on many occasions keeps abusing and physically assault[ing] me by squeezing my hands and arms, and also by trying to break my hand whenever he cuffs me up and holds me for escorting purposes.

[ECF No. 337-21 at 3].  The "Date of Incident" on the form is August 1, 2014.  [Id.].  The form does not mention Merlino, Bull or any other alleged use of excessive force.  See [id.]

In addition, Montrond's medical record reflects that on August 5, 2014, he refused a medical assessment on two occasions.  [SOF ¶¶ 235–236].

### 5.  August 11, 2014 Excessive Force (Count V)

Montrond alleges and testified that on August 11, 2014, DOC Defendant Walburn used excessive force when he "raised and pulled [Montrond's] arms up as he was hand-cuffed" and "squeezed and twisted [his] hands and wrists" until his finger and hands bled.  [SOF ¶¶ 238–242 (internal quotation marks omitted)].  He was treated with a Band-Aid, [id. ¶¶ 243–246], and he testified that the incident "pushed him back into severe mental illness," [id. ¶ 247].

### 6.  July and August 2014 Deprivation of Water and Toilet Paper (Count VI)

Montrond alleges that on July 30, 2014, DOC Defendants Bibeau and S. Loughran deprived him of toilet paper.  [SOF ¶¶ 173, 184, 200, 202].  Regarding Bibeau, a July 30, 2014 video shows Bibeau giving Montrond toilet paper.  [Id. ¶ 201].  As to S. Loughran, he was on "eyeball watch" duty over Montrond in his cell that day.  [Id. ¶¶ 204, 207].

Though Montrond testified that he could only remember being denied toilet paper on this one specific date, he disputes that this implies that he was not denied toilet paper on other dates as well.  [Id. ¶ 174].  He testified that his bowels and stomach were in pain for two or three days after, [id. ¶¶ 177, 198], and that he suffered mental distress as a result of the incident, [id. ¶ 179].  There is nothing in his medical record reflecting that he complained of his injuries.  [Id. ¶ 192].

In addition, Montrond alleges and testified that between July and September, 2014, Chaplin, Bull, Walburn, and Bibeau shut off his water.  [SOF ¶¶ 250–254].  His medical record indicates that between July and August 2014, he "was on at least two hunger strikes" and "was repeatedly offered food and water."  [Id. ¶ 266].  It also reflects that he was offered and/or refused water on several specific occasions.  [Id. ¶ 267].

He testified that he experienced mental and emotional injuries, but not physical injury from the denial of water.  [SOF ¶ 255–256].

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).  "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id.  When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Id.  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and

material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

## III. DISCUSSION

### A. PLRA Exhaustion Requirement (Counts IV and VII)

As an initial matter, the DOC Defendants argue that the Court should find in their favor for the Eighth Amendment and Article 26 claims involving the alleged denial of crutches by Bibeau on July 30, 2014 (Count VII), and the alleged excessive force by Bull, Chaplin, and Merlino on August 5, 2014 (Count IV), because Montrond failed to exhaust his administrative remedies for those claims. [ECF No. 323 at 5]; see also [SAC ¶¶ 146–148 (Count IV), 154–156 (Count VII)].

42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  Massachusetts similarly requires exhaustion of administrative remedies.

Mass. Gen. Laws ch. 127, §§ 38E–38F; see also Cook v. Turco, No. 18-cv-30137, 2020 WL

8971533, at *9 (D. Mass. Dec. 23, 2020) (citing to Mass. Gen. Laws ch. 127, §§ 38E–38F and 42

U.S.C. § 1997e(a) to determine whether a prisoner plaintiff exhausted all administrative

remedies).[6]  The requirement to exhaust administrative remedies is strict, Margalia v. Maloney,

365 F. Supp. 2d 76, 81 (D. Mass. 2005), and is a question of fact, Cook, 2020 WL 8971533, at

*10.

The Massachusetts inmate grievance process is set out in 103 Massachusetts Code of

Regulations §§ 491 et seq.  As relevant here, 103 C.M.R. § 491.11 provides that

> [t]he following issues are not grievable under 103 CMR 491.00: (a) Any decision or recommendation for which there is an existing appeal mechanism, including, but not limited to, classification, disciplinary decisions and recommendations, observation of behavior report decisions and recommendations, decisions and recommendations concerning therapeutic diets, religious practices, and medical or clinical decisions related to an inmate's physical or mental condition, as the medical contractor is required to maintain its own grievance procedure, however, matters concerning access to medical or mental health care are grievable. . . .  A grievance may only be filed concerning one subject matter.  Grievances and appeals based on different events shall be presented separately unless it is necessary to combine the issues to support the claim.

103 C.M.R. § 491.11(1), (5).  In addition, 103 C.M.R. § 491.14 provides that

---

[6] Mass. Gen. Laws ch. 127, § 38F specifically provides that "[a]n inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E," and § 38E provides that "[t]he commissioner shall promulgate regulations [for] . . . grievances filed against the department, its officers or employees, by inmates who are committed to" a Massachusetts correctional facility. Mass. Gen. Laws ch. 127, §§ 38E–38F.

[i]nmates shall submit grievances by utilizing the designated form.  Forms should be legible, presented in a courteous manner and should include: (a) the date submitted; (b) the date the incident occurred; (c) the name of the institution where the incident occurred; (d) a complete statement of the facts relevant to the grievance.  Statements should be brief and include only that information that is necessary to support the grievance; (e) the remedy being requested; (f) the inmate's signature; and (g) the step 1 informal complaint form.

103 C.M.R. § 491.14(2).  Finally, 103 C.M.R. § 491.16 provides that

[u]pon receipt of the grievance decision, the inmate may appeal the decision to the appellate authority within ten business days. . . .  The grounds for the appeal must be consistent with the issues raised in the original grievance.  The remedy requested on appeal cannot exceed what was originally requested through the grievance.

103 C.M.R. § 491.16(1).

Here, although Montrond admits that he did not file a grievance about Bibeau denying him crutches, [SOF ¶ 165], or a grievance explicitly referencing a use of force on August 5, 2014, [id. ¶ 220], he disputes that he "did not file any grievances regarding the DOC and medical staff's failure to provide him with crutches," [id. ¶ 165 (citing ECF No. 337-17 (Appeal of Grievance No. 75187)], and that he "did not file a grievance addressing Chaplin's excessive use of force, including those that occurred on August 5, 2014," [id. ¶ 220 (citing ECF No. 337-21 (Grievance No. 75326))].

In response, regarding the crutches, the DOC Defendants argue that Grievance No. 75187 is a medical grievance procedure that is distinct from the DOC's grievance process and that, in any event, the grievance related to an incident on August 13, 2014, in which he was not seen by medical staff, not a July 30, 2014 denial of crutches by Bibeau.  See [ECF No. 343 at 17–19].  In addition, with respect to the August 5 incident, the DOC Defendants argue that Grievance No. 75326 referred to a separate incident on August 1, 2014, not the alleged incident on August 5, 2014 that purportedly involved Merlino, Bull, and Chaplin.  [Id. at 19].

Regarding the denial of crutches, the Court rules that Grievance No. 75187 was directed toward an "incident" on "20140813" (August 13, 2014) in which, after complaining that he did not have an "ankle bracelet, bandages, or [c]rutches to support and treat [his] ankle injury," Montrond was told "that a nurse w[ould] be seeing [him] on 8/13/14," but did not, and thus he was requesting "some medical devices for [his ankle] and [c]rutches for support."  See [ECF No. 342-1 at 3].  As to this, in his appeal, Montrond stated that

> my medical needs are [not] being met while same time my request for crutches and medical devices are being denied, and accommodation to wheelchair has expired. The decision is completely contrary to my medical needs and requests.

[ECF No. 337-17].  In totality, in light of (1) the grievance and appeal confirming that the grievance was directed to medical staff's failure to see Montrond and its decision to deny him crutches, see [ECF No. 337-17; ECF No. 342-1 at 3], (2) his admission that he "did not file a grievance about Bibeau denying him crutches," [SOF ¶ 165], and (3) the requirement that "[a] grievance may only be filed concerning one subject matter[, g]rievances and appeals based on different events shall be presented separately unless it is necessary to combine the issues to support the claim,"[7] 103 C.M.R. § 491.11(5), the Court rules that Montrond did not grieve the July 30, 2023 denial of crutches by Bibeau, and thus has not exhausted administrative remedies for this claim as required by the PLRA.[8]

---

[7] There is no indication that it was necessary to combine these issues to support Plaintiff's claim.

[8] Because the Court decides that Plaintiff did not grieve the denial of crutches by Bibeau, it need not decide whether a medical grievance that is not subject to DOC review can exhaust a claim under the PLRA.  See [ECF No. 343 at 18]; see also CMR § 491.11 ("The following issues are not grievable under 103 CMR 491.00: (a) . . . medical or clinical decisions related to an inmate's physical or mental condition, as the medical contractor is required to maintain its own grievance procedure, however, matters concerning access to medical or mental health care are grievable.").

In addition, Plaintiff argues that "a reasonable trier of fact could find that DOC Defendants used excess force on Montrond on August 5 and 11, 2014 and acted with deliberate indifference on

With respect to the alleged August 5, 2014 use of force by Chaplin, Bull, and Merlino, the Court similarly finds that Grievance No. 75326 details a separate incident involving officer Chaplin's "squeezing [Montrond's] hands and arms, and also by trying to break [his] hand whenever [Chaplin] cuffs [Montrond] up and holds [him] for escorting purposes," [ECF No. 337-21 at 3], and does not pertain to an alleged incident on August 5, 2014 involving the use of force by Chaplin, Bull, and Merlino.  Further, Montrond has further admitted that he "did not file a grievance explicitly referencing a use of force on August 5, 2014," [SOF ¶ 220].  Because 103 C.M.R. § 491.11(5) requires that "[g]rievances and appeals [be] based on different events shall be presented separately unless it is necessary to combine the issues to support the claim,"[9] the Court rules that Montrond has also failed to exhaust administrative remedies as required by the PLRA with respect to the alleged August 5, 2014 incident involving the use of force by Chaplin, Bull, and Merlino.

Accordingly, the Court grants summary judgment in the DOC Defendants' favor on Count IV insofar as it alleges a specific use of force by Merlino, Bull and Chaplin on August 5, 2014,[10] and on Count VII in its entirety without prejudice.

---

July 30, 2014 by denying him access to toilet paper, water, and his crutches.  [ECF No. 336 at 21].  At most, only the reference to August 5 is relevant to the claims in Counts IV and VII, see [SAC ¶¶ 146–148 (Count IV); id. ¶¶ 154–156 (Count VII)], and for the alleged incident Plaintiff admits that he "did not file a grievance regarding a Use of Force on August 5, 2014," [SOF ¶ 220].

[9] There is no indication that it was necessary to combine these issues to support Plaintiff's claim.

[10] Although Plaintiff did not grieve a specific use of force by Merlino, Bull and Chaplin on August 5, 2014, see supra, Grievance No. 75326 does sufficiently complain about officer Chaplin's "squeezing [his] hands and arms, and also by trying to break [his] hand whenever he cuffs me up and holds me for escorting purposes," [ECF No. 337-21 at 3], to satisfy the exhaustion requirement.

**B.      PLRA Injury Requirement (Counts IV and VI)**

The DOC Defendants next argue that they are entitled to summary judgment on

Montrond's claims regarding Chaplin's conduct between August 1 and 5, 2014 (Count IV), and

the deprivation of water by Chaplin, Bull, Walburn and Bibeau in July and August, 2014 (Count

VI), because Montrond "seeks damages for mental and emotional injuries for these claims[,]

which cannot proceed under the PLRA."  [ECF No. 323 at 9].

   PLRA § 1997e(e), provides the following:

> Limitation on recovery.  No Federal civil action may be brought by a prisoner
> confined in a jail, prison, or other correctional facility, for mental or emotional
> injury suffered while in custody without a prior showing of physical injury . . . .

42 U.S.C. § 1997e(e).

In this Court's Order on the DOC Defendants' motion to dismiss, the Court explained

that "'[t]he First Circuit has not definitively ruled on the applicability' of the bar to recovery

under § 1997e(e) where physical injury is not alleged in connection with constitutional claims,

'or whether it applies to nominal and punitive damages in addition to compensatory damages.'"

[ECF No. 168 at 30 (quoting Hudson v. MacEachern, 94 F. Supp. 3d 59, 67 (D. Mass. 2015)

(citing Cryer v. Spencer, 934 F. Supp. 2d 323, 336 (D. Mass. 2013) (discussing circuit split)))].[11]

"'The First Circuit has suggested, however, that the bar does not apply to nominal and punitive

damages.'"  [Id. (quoting MacEachern, 94 F. Supp. 3d at 67 (citing Kuperman v. Wrenn, 645

F.3d 69, 73 n.5 (1st Cir. 2011))].  As Montrond seeks punitive damages in connection with

constitutional violations here, [SAC at 26, 28, 32], the Court declines to grant summary

judgment in the DOC Defendants' favor on the basis of Montrond's purported failure to show

---

[11] But see Mattei v. Dunbar, 217 F. Supp. 3d 367, 380 (D. Mass. 2016) (dismissing
compensatory damages portion of a First Amendment claim holding "that § 1997e(e) precludes
compensatory damages for mental and emotional injuries absent a showing of physical injury,
regardless of whether the claims at issue are of a constitutional nature or not").

physical injury for certain claims.  Kuperman, 645 F.3d at 71, 73 n.5 ("requests for nominal and

punitive damages [were] enough to keep his claims alive" where alleged injury was a shaving

requirement that conflicted with inmate's religious beliefs); see also Jones v. Higgins-O'Brien,

No. 16-cv-11666, 2018 WL 935421, at *5 n.2 (D. Mass. Feb. 16, 2018) (declining to dismiss

claims for compensatory damages under § 1997e(e) in the absence of physical injury due to the

unsettled state of the law).

### C.    Expert Testimony

The DOC Defendants next argue that Montrond cannot testify regarding the following

injuries without a medical expert, and that no medical expert has been disclosed: (1) for the

March 13, 2014 incident, "head injuries, mental/emotional injuries, [] scratch and bump bruises

to my head, face, under my left eye, eyebrow" as well as "migraines and a concussion," [ECF

No. 323 at 12 (internal quotation marks omitted)]; (2) for the July 15, 2015 incident, "his ankle

was nearly broken, . . . head injuries, scrapes and body – scrapes and bruises to body, face,

emotional and mental injuries," [id. (internal quotation marks omitted)]; (3) for the July 30, 2014

denial of toilet paper, "his bowels and stomach were in pain for probably two, maybe three days,

and he suffered severe emotional distress," [id.]; (4) for the August 5, 2014 incident,

"exacerbation to his ankle injury and . . . headaches," [id. at 13]; and (5) for the August 11, 2014

incident, "severe cuts to finger that bled and se[vere] mental and emotional distress," [id.].

In short, the DOC Defendants aver that "Section 1983 imposes a causation requirement

similar to that of ordinary tort law," [ECF No. 323 at 15 (internal quotation and citation

omitted)], and that causation must be established through expert opinion, see [id.].

Although a "causal link" between an action and injury "generally must be established by

expert testimony, . . . [w]here a reasonable juror could infer causation from other evidence,

expert testimony is not required to establish causation."  Crooker v. United States, No. 13-cv-

30199, 2015 WL 430289, at *4 (D. Mass. Feb. 3, 2015).[12]  For example, in Crooker, another

session of this court denied summary judgment and found that a plaintiff "d[id] not need expert

testimony to establish causation" where he alleged that he experienced "headaches" at times

when he was unable to wear glasses in prison.  Id. at *2, 4.  The court explained that the plaintiff

could

> testify not only as to the alleged pain and suffering they caused him, but also as to
> their timing—when they began and when they ended (if at all).  Depending on the
> nature of this testimony, it could establish that plaintiff only experiences headaches
> when not wearing glasses and never experiences them when wearing glasses.
> Although "[c]orrelation is not causation," this level of correlation could (again,
> depending on the specific testimony) be sufficiently strong that a reasonable jury
> could conclude that it is more probable than not that plaintiff's headaches were
> caused by his lack of eyeglasses.

Id. at *4 (quoting Samaan v. St. Joseph Hops., 670 F.3d 21, 33 & n.6 (1st Cir. 2012)); cf.

Haggerty v. McCarthy, 181 N.E.2d 562, 565 (Mass. 1962) ("It is only in exceptional cases that a

jury instructed by common knowledge and experience may without the aid of expert medical

opinion determine whether the conduct of a physician toward a patient is violative of the special

duty which the law imposes as a consequence of this particular relationship. . . .  The exceptional

cases seem to be those where the negligence and harmful results are sufficiently obvious as to lie

within common knowledge.") (internal citations and quotations omitted).

    In contrast, in Barbosa v. Hyland, another session of this court found that "[a] medical

expert may be required where the cause of an injury claimed to have resulted from a negligent

---

[12] To the extent that DOC Defendants believe that Plaintiff also cannot testify regarding whether
he actually experienced the alleged injuries, it cannot "be said that plaintiff cannot demonstrate
'actual damage or injury' without expert testimony."  Crooker, 2015 WL 430289, at *4.  For
example, in Crooker, the court found that where plaintiff asserted that he experienced headaches
and impairment of his eyesight, "[p]laintiff's proof of actual injury [] turn[ed] on the credibility
of his own testimony (assuming he [would testify]) and any other evidence that may support his
self-reported claims of injury.  Under the circumstances, no expert witness [wa]s needed to
prove" actual injury.  Id.

act is a complicated medical question involving fact finding which properly falls within the province of medical expert." 2013 WL 6244157 at *21 (D. Mass. Dec. 2, 2013) (internal citation and quotation omitted). There, the court found that it could "accept [the individual's] testimony regarding her perceived pain and anxiety, in the absence of an expert opinion," but could not "find that her complaints of continued debilitating pain and suffering were substantially caused by the events" in question that occurred years earlier. Id. at *21.

Here, the Court declines to grant summary judgment on the basis that no medical expert has been disclosed. Like the plaintiff in Crooker, Montrond may testify "as to the alleged" injuries and "their timing—when they began and when they ended (if at all)," 2015 WL 430289, at *4, including by referring to, for example, his prison medical and progress records, see, e.g., [ECF Nos. 337-4, 337-7, 337-8, 337-9, 337-10, 337-14, 337-15], so long as he can sufficiently establish their admissibility.

### D.      Eighth Amendment Claims (Counts I and III–VI)

Remaining Counts I and III–VI bring claims under 42 U.S.C. § 1983 for alleged violations of Montrond's Eighth Amendment rights and Article 26.[13]

The Eighth Amendment requires prison officials to "provide humane conditions of confinement[,] . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).

---

[13] Article 26 provides that "[n]o magistrate or court of law, shall . . . inflict cruel or unusual punishments." Mass. Const. Pt. 1, Art. 26. The Article 26 standard is "virtually identical" to that of the Eighth Amendment. Lopes v. Riendeau, No. 14-cv-10679, 2017 WL 1098812, at *4 (D. Mass. Mar. 23, 2017) (quoting Cryer v. Spencer, No. 11-cv-10654, 2012 WL 892883, at *7 (D. Mass. Mar. 15, 2012)). "Because Article 26 and the Eighth Amendment guarantee essentially the same scope of rights, there is no need for separate analyses." Carter v. Symmes, No. 06-cv-10273, 2008 WL 341640, at *5 n.3 (D. Mass. Feb. 4, 2008). Accordingly, the Court only analyzes Plaintiff's claims through the Eighth Amendment lens.

"Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment.  The Eighth Amendment is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'"  Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (quoting Estelle v. Gamble, 429 U.S. 97, 103, 105–06 (1976)).  That said, the Eighth Amendment "does not mandate comfortable prisons," but rather prohibits "inhumane ones."  Abernathy v. Anderson, 984 F.3d 1, 6 (1st Cir. 2020) (quoting Farmer, 511 U.S. at 832); see also Hudson v. McMillian, 503 U.S. 1, 8–9 (1992) ("extreme deprivations are required to make out a conditions-of-confinement claim.  Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' . . . 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'" (internal citation omitted) (first quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981); and then quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991))).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect."  Staples v. Gerry, 923 F.3d 7, 13 (1st Cir. 2019).  Here, Montrond's claims fall in two categories: (1) uses of excessive force (Counts I (March 13, 2014), III (July 15, 2014), IV (August 1–5, 2014), and V (August 11, 2014)); and (2) the withholding of basic necessities (Count VI (July 30, 2014 deprivation of toilet and July and August 2014 Deprivation of Water)).

### 1.   Uses of Excessive Force (Counts I, III, IV and V)

With respect to the uses of force, "[t]he objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.'"  McMillian, 503 U.S. at 8 (quoting Estelle, 429 U.S. at 103); see also Staples, 923 F.3d at 13 ("[t]o prevail on the

objective prong, [Montrond] must show that 'the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.'" (quoting McMillian, 503 U.S. at 8 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)))).  "In the excessive force context, . . . [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident."  McMillian, 503 U.S. at 9 (citing Whitley v. Albers, 475 U.S. 312, 327 (1986)).

The subjective prong, on the other hand, "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"  Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 320–21).  Importantly, "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action," McMillian, 503 U.S. at 9, and "*de minimis* uses of physical force" are not prohibited, "provided that the[y are] . . . not of a sort 'repugnant to the conscience of mankind,'" id. (quoting Whitley, 475 U.S. at 327 (quoting Estelle, 429 U.S. at 106)).

"The 'factors' that 'are relevant to that ultimate determination' include 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials,' 'the need for the application of force,' 'the relationship between the need and the amount of force that was used,' 'the extent of the injury inflicted,' and 'any efforts made to temper the severity of a forceful response.'"  Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 321).

a.    *March 13, 2014 Use of Force (Count I)*

Montrond alleges that on March 13, 2014, (1) Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal and Fitzpatrick used excessive force, [SAC ¶ 132], (2) Bressler, Paone-Stuart, and Donahue failed to intervene, [id. ¶ 133], and (3) Letendre and Donahue failed to supervise, train, and/or discipline the officers involved, [id. ¶ 135].

First, with respect to excessive force, Montrond refers to a video in which no actual force is visible, see [ECF No. 337-26 (video provided in native format)], and states that at the end of the video, after Montrond entered an office, "[m]ovement in the [o]ffice is visible," and that "[t]his is when the physical confrontation occurs," [ECF No. 336 at 10]. In the video, multiple officers converge on the scene after the "movement," and it appears that Montrond is escorted out shortly thereafter. See [ECF No. 337-26 at 2:34 PM]. The alleged incident lasts less than three minutes. See [id. at 2:32 PM–2:34 PM].

As for the particular DOC Defendants, in addition to alleging that he was assaulted by Letendre, [SOF ¶¶ 19, 33], Plaintiff testified that (1) "he cannot state specifically which alleged injuries were caused by defendant Frederick Loughran," [id. ¶ 38], (2) he "'can't say specifically' what defendant Gonzalez did to him during the Use of Force," [id. ¶ 40], (3) he was injured by Healey "[b]ecuase he used force upon me," [id. ¶ 44], and (4) Macal, Ricketts, and Fitzpatrick responded to the incident, [id. ¶¶ 45–46, 48]. Finally, Montrond alleges that Gonzalez punched him in the medical unit after the incident, [id. ¶ 21], which caused headaches, [id. ¶ 42].

Setting aside whether Defendant Letendre or Montrond is lying about the reasons for the use of force, see [ECF No. 336 at 14–15 (arguing that Montrond's telling of events is more credible than the DOC Defendants)], it is not disputed that Montrond was seen by medical staff after the incident. [SOF ¶¶ 25–26; ECF No. 321-5 at 70]. The nurse who saw him wrote "[r]ight eyebrow with swelling and several scattered small scratches." [SOF ¶ 26; ECF No. 321-5 at 71]. In addition, at his deposition, Montrond testified that "his injuries from the March 13, 2014" incident include "head injuries, mental/emotional injuries, [] scratch and bump bruises to my head, face, under my left eye, eyebrow." [SOF ¶ 24]. He further testified that he suffered a

concussion as a result of the incident, [id. ¶ 28], and still suffers from "migraines," [id. ¶ 27], though those are his own conclusions, without the benefit of a medical diagnosis, [id. ¶¶ 28–30]. He also has not been told by a medical professional that his current headaches are related to the March 13, 2014 incident.  [Id. ¶ 31].  Nevertheless, Montrond continued to seek treatment due to headaches, leg pain, and pain under his eye through at least April 4, 2014.  [Id. ¶ 32]; see also [ECF Nos. 337-4; 337-11].

In totality, although the alleged use of force is not visible on video, there appears to be very little, if any, disturbance prior to the alleged incident.  Montrond was significantly outnumbered by prison staff, and he was injured as a result of the events.  [ECF No. 337-26]. Considering the Staples factors, and viewing the facts in the light most flattering to Montrond, see Cochran, 328 F.3d at 6, there is a dispute of material fact as to what force was applied and whether there was any threat to the safety of staff, any need for physical force, and any effort to de-escalate the situation.  See Staples, 923 F.3d at 13.  Moreover, even if Montrond's injuries were not severe, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  Wilkins v. Gaddy, 559 U.S. 34, 38 (2010); see also McMillian, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident." (internal citation omitted)).  Accordingly, the Court rules that there are disputes of

material fact as to whether Letendre, Gonzalez, F. Loughran, Healey, Macal, Ricketts, and Fitzpatrick used excessive force on March 13, 2014.[14]

Second, regarding the failure to intervene, an officer can be liable for failing to intervene when "[1] he or she was present when excessive force was used; [2] observed the use of excessive force; [3] was in a position where he or she could realistically prevent that force; and [4] had sufficient time to do so."  Davis v. Rennie, 264 F.3d 86, 102 (1st Cir. 2001); see also Sanders v. Arseneault, No. 19-cv-12284, 2021 WL 982452, at *6 (D. Mass. Mar. 16, 2021) (same).

With respect to the first two elements, Bressler and Paone-Stuart were present for and observed the March 13, 2014 incident.  See, e.g., [ECF No. 336 at 11–12]; see also [ECF No.

---

[14] The Court notes that the allegations regarding excessive force used by F. Loughran, Healey, Macal, Ricketts, and Fitzpatrick are very thin.  See [SOF ¶¶ 38, 40, 44–46, 48].  On the one hand, "when the dispute is about the extent of an identified officer's participation in excessive force, that is an issue for the jury[,] not a reason to dismiss the claim."  Maselli v. Durden, No. 19-cv-01248, 2022 WL 18542272, at *6 (D.N.H. Mar. 28, 2022); see also Pineda v. Hamilton Cnty., 977 F.3d 483, 492–93 (6th Cir. 2020) ("[P]laintiffs may proceed to trial if they place each 'individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence[.]'  . . . That is so even if the plaintiffs cannot 'identify clearly which officers committed specific acts during the incident[.]'" (quoting Fazica v. Jordan, 926 F.3d 283, 292 (6th Cir. 2019)).  On the other hand, an excessive force claim cannot stand "when the plaintiff names a group of officers but cannot identify the perpetrator of the force used against him."  Maselli, 2022 WL 18542272, at *6; see also Pineda, 977 F.3d at 493 ("[A] § 1983 plaintiff must . . . present evidence from which a jury could find that each defendant engaged in an unconstitutional act.  Fazica merely relieves the plaintiff of the summary-judgment burden to pinpoint which specific officer committed which specific unconstitutional act.  It does not relieve the plaintiff of the burden to create a triable issue of fact over whether every defendant has violated the Constitution.") (emphasis omitted).  Here, where there is video suggesting that each of F. Loughran, Healey, Macal, Ricketts, and Fitzpatrick entered the office in which the incident occurred, [ECF No. 337-26], and there are disputed facts regarding the specific acts and force used by these individuals as part of the group, the Court declines to grant summary judgment in their favor, but notes that without additional evidence of particular harm caused by these particular DOC Defendants at trial, a claim for excessive force may be difficult to sustain as to these Defendants.

337-26].[15]  There is no evidence that Donahue was present, however, see [SOF ¶ 53 (admitting that Montrond "testified that he did not know where defendant Donahue was at the time of the alleged assault")], and thus a failure to intervene claim cannot be sustained against Donahue with respect to the March 13, 2014 incident.  See Davis, 264 F.3d at 102; see also Sanders, 2021 WL 982452, at *6.

Regarding the third and fourth elements of a failure to intervene claim, the DOC Defendants do not argue that Bressler could not prevent the force and did not have sufficient time to do so.  Thus, the Court declines to grant summary judgment on the failure to intervene claim for Bressler.

With respect to Paone-Stuart, the DOC Defendants aver that Paone-Stuart was non-security staff and it was not her duty to intervene if she witnessed what she considered to be excessive force.  [ECF No. 323 at 35].  As an initial matter, the parties dispute whether Paone-Stuart's role limited her obligation to intervene to prevent harm to Montrond.  See [SOF ¶¶ 60–61].  Moreover, even if Paone-Stuart did not have a duty or the responsibility to physically intervene, she could have called for help, and the First Circuit has found that a nurse in similar circumstances had a duty and failed to intervene.  See Davis, 264 F.3d at 104 (affirming finding that nurse failed to intervene where, even if "she did not have the same duty to physically intervene that the [others] had[,] . . . [she] could have intervened simply by calling to [the offending officer] to stop").  Accordingly, the Court declines to grant summary judgment on the failure to intervene claim for Paone-Stuart.

---

[15] The DOC Defendants argue that because there were only de minimis injuries and no Eighth Amendment violation, Donahue, Bressler, and Paone-Stuart did not fail to intervene.  [ECF No. 323 at 35].  As explained above, however, there are disputes of material fact as to whether there was an Eight Amendment violation on March 13, 2014, and thus whether excessive force was used.

Finally, Montrond alleges that Letendre and Donahue failed to supervise, train, and discipline officers with respect to the March 13, 2014 incident.  See [ECF No. 323 at 49].[16]  In general, and among other things, the DOC Defendants argue that they are entitled to summary judgment on these claims because (1) "it appears" the failure to supervise claims are based solely on the fact that Letendre and Donahue "held a higher rank than correction officer," [ECF No. 323 at 49]; (2) Letendre and Donahue were not responsible for training, all relevant officers were in compliance with relevant trainings, and Montrond has "no evidence to support his claims that several of the DOC defendants failed to train other DOC defendants," [id. at 49–50]; and (3) Letendre and Donahue were not responsible for discipline and "there is no evidence to support plaintiff's claims for failure to discipline," [id. at 50–51].  Montrond does not respond to these arguments.

Where, as here, the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions."  Nansamba, 727 F.3d at 40.  Because Montrond has failed to rebut DOC Defendants' argument regarding Letendre and Donahue's supervisory and failure to train liability, the Court grants summary judgement on these issues.

In sum, with respect to Count I, the Court denies summary judgment on the issues of whether (1) Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal, and Fitzpatrick used excessive force, and (2) Bressler and Paone-Stuart failed to intervene.  The Court grants

---

[16] The Court notes that in the SOF, in response to statements of fact relating to training and discipline, Plaintiff states that "Montrond has recently agreed to dismiss the claims against the Failure to Supervise Defendants," see, e.g., [SOF ¶¶ 326, 345], who are defined as Spencer, Thompson, Bissonnette, and Bairos, [id. ¶ 3].  It is unclear whether Plaintiff maintains those claims against Letendre and Donahue, so the Court addresses them here.

summary judgment on the issues of whether (1) Letendre and Donahue failed to supervise the DOC Defendants, and (2) Donahue failed to intervene.

> <em>b.   July 15, 2014 Use of Force (Count III)</em>

Regarding the July 15, 2014 incident, Montrond alleges that Ryan, Santos, Merlino, and Bull used excessive force, [SAC ¶ 140], and that Sid and Giansanti failed to intervene, [id. ¶ 141].

As explained above, the July 15, 2014 incident was captured on a video, [ECF No. 321-11], which the Court can consider on summary judgement to, where appropriate, discredit a party's description of events.  Scott v. Harris, 550 U.S. 372, 380–81 (2007) (where, with respect "to the factual issue whether respondent was driving in such fashion as to endanger human life," and where "Respondent's version of events [wa]s so utterly discredited by the record that no reasonable jury could have believed him[,] [t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"); see also id. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Here, the video contradicts Montrond's claims that, for example, he was hit with a shield in any malicious or sadistic way, or that he was "slammed" against the wall.  [SOF ¶¶ 92–93, 99–100]; see also [ECF No. 321-11].[17]  Instead, the video depicts officers communicating with Montrond regarding the need to move him, moving him in a controlled manner, and using some force,

---

[17] Though Plaintiff argues that Giansanti did not record him being assaulted, [SOF ¶ 106], that claim is contradicted by the video, which shows the entire move from cell to cell, including instances when DOC Defendants use force, see [ECF No. 321-11].  In fact, Plaintiff concedes in his opposition that "the entire set of . . . events are captured on a prison videotape."  [ECF No. 336 at 18].

including when, as Montrond admits, he did not comply with a request "to go to the back of the cell when ordered to do so" so that the Officer Defendants could open the door to let another inmate into the cell. [ECF No. 321-11 at 11:46–11:51 AM; ECF No. 336 at 20]; see also Staples, 923 F.3d at 13.

With respect to the shield, per the video, once the officers move Montrond to the back of the cell, the shield is immediately passed over the officers' heads to the bed, seemingly to free up their hands to keep Montrond confined to the back of the cell while a second inmate is moved in. [ECF No. 321-11 at 11:47 AM]. Although the video runs continuously, the actions of the officers in the cell are sometimes obscured by the officers who are positioned between the camera and Montrond. [Id. at 11:47–11:48 AM]. Nonetheless, there is no opportunity for the shield to be used as described by Montrond as the shield is depicted throughout the video from the time the officers enter the cell until it is put on the bed. [Id.]. Further, there is nothing that can be seen in the video that suggests the large movements on the part of the officers that one would expect to see with forceful pushing or slamming. [ECF No. 321-11 at 11:47–11:48 AM]. Moreover, when Montrond is shown talking to the nurse, there is no evidence of a head injury. [Id. at 11:48–11:49 AM]. Even acknowledging that there is a short period of time when the actions of the officers surrounding Montrond in the back of the cell can't be clearly seen, [id. at 11:47–11:48], the injuries purportedly suffered by Montrond as a result of the incident—scrapes, headaches, and an injury to his ankle, [SOF ¶ 64]—are not severe. Thus, having considered the factors set forth in Staples, the Court rules that no reasonable jury could find that the force on July 15, 2014 was not "applied in a good faith effort to maintain or restore discipline," and was used "maliciously and sadistically for the very purpose of causing harm.'" See Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 320–21); see also McMillian, 503 U.S. at 9–10 (not "every

malevolent touch by a prison guard gives rise to a federal cause of action. . . . The Eighth

Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from

constitutional recognition de minimis uses of physical force, provided that the use of force is not

of a sort 'repugnant to the conscience of mankind.'" (quoting Whitley, 475 U.S. at 327)).

In addition, because the Court rules that there was no excessive use of force on July 15,

2014, Montrond cannot sustain a claim for failure to intervene.  See Davis, 264 F.3d at 102 (an

officer can be liable for failing to intervene when "he or she was present when excessive force

was used; observed the use of excessive force; was in a position where he or she could

realistically prevent that force; and had sufficient time to do so.").

Accordingly, the Court grants DOC Defendants' motion for summary judgment on Count

III.

### c.      August 1–5 and 11, 2014 Excessive Force (Counts IV & V)

Montrond next claims that between August 1 and 5, 2014, Chaplin applied "unnecessary

twists, squeezes, and excessive force on his wrists and hands, including excessive squeezes on

his arms."  [SOF ¶¶ 208, 211 (internal quotations omitted)].  Montrond did not, however, suffer

any physical injuries and did not receive medical treatment for the events between August 1 and

4, 2014.  [Id. ¶ 214].  Rather, he testified that his injuries were "mental" and "emotional."  [Id.

¶ 217].

In addition, he avers that on August 11, 2014, Walburn used excessive force when he

"raised and pulled [Montrond's] arms up as he was hand-cuffed" and "squeezed and twisted [his]

hands and wrists" until his finger and hands bled.  [SOF ¶¶ 238–242 (internal quotation marks

omitted)].  He was treated with a Band-Aid, [id. ¶¶ 243–246], and he testified that the incident

"pushed him back into severe mental illness," [id. ¶ 247].

With respect to the August 1–5 incident, the DOC Defendants generally argue that they are entitled to summary judgment because Montrond did not suffer any physical injuries.  See [ECF No. 323 at 11].  Regarding the August 11 event, DOC Defendants argue that "[p]ulling on plaintiff's arms while he was handcuffed is not 'extreme or intrusive physical contact'" that results in a constitutional violation of Montrond's rights.  [ECF No. 323 at 41 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005))].  Perhaps conceding the argument, Montrond did not respond.  See generally [ECF No. 336].

Considering the Staples factors for both incidents, see 923 F.3d at 13, and noting in particular the minimal alleged force and resulting injury, if any, see McMillian, 503 U.S. at 9–10; Staples, 923 F.3d at 13, the Court rules that even viewing the undisputed facts in the light most favorable to Montrond, there are insufficient facts to make out a constitutional violation for the August 1–5 or August 11, 2014 conduct, and thus grants the DOC Defendants' motion for summary judgment on claims IV and V.

### 2.  Deprivation of Toilet Paper and Water (Count VI)

Deprivations of toilet paper and water can rise to a constitutional violation under the Eighth Amendment depending on their duration and severity.  For example, inadequate provision of drinking water for several days can state a claim for relief.  See Stile v. U.S. Marshals Serv., No. 15-cv-00494, 2016 WL 3571423, at *4 (D.N.H. May 9, 2016), R. & R. adopted, 2016 WL 3582027 (D.N.H. June 27, 2016).  In addition, prisoners must be provided with adequate hygienic supplies, such as toilet paper, and courts "have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement." Trammell v. Keane, 338 F.3d 155, 165 (2d Cir. 2003).  Nevertheless, "[t]he failure to supply a prisoner with toilet paper for a short period of time . . . does not violate the Eighth Amendment." Gayden v. IDOC, No. 20-cv-01079, 2020 WL 6203061, at *1 (S.D. Ill. Oct. 22, 2020).

Montrond's claims for deprivation of toilet paper and water survive summary judgment because there remain questions of fact surrounding the purported withholding of both over a period of several weeks.  See [SOF ¶¶ 174, 184, 250–254].  Though the factual allegations are extremely thin, and while it is true that Montrond's claims are vague and that there is contradictory evidence in the record, the Court does not weigh disputed evidence at this stage and must view the evidence in the light most flattering to Montrond.  Fed. R. Civ. P. 56(a); Cochran, 328 F.3d at 6.  Accordingly, the Court denies summary judgement on Count VI.

### E.    Assault and Battery Claim (Count VIII)

"Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'"  Lachance v. Town of Charlton, 368 F. Supp. 3d 231, 245 (D. Mass. 2019), aff'd, 990 F.3d 14 (1st Cir. 2021) (quoting Jesionowski v. Beck, 937 F. Supp. 95, 105 (D. Mass. 1996) (quoting Commonwealth v. McCan, 178 N.E. 633, 634 (Mass. 1931))). "Massachusetts law . . . allows for assault and battery claims against officers who use excessive force," and "[t]he standard for determining whether force is reasonable for an assault and battery claim is 'essentially the same' as the standard for determining whether it is reasonable for excessive force claims."  Id. (citing Dean v. Worcester, 924 F.2d 364, 369 (1st Cir. 1991)). Thus, "[w]here a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the court's] determination of the reasonableness of the force used under § 1983 controls [the court's] determination of the reasonableness of the force used under the common law assault and battery claims."  Id. (quoting Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010)).

As an initial matter, having granted summary judgement in favor of Ryan, Santos, Merlino, Bull, Chaplin, and Walburn and on the excessive force claims against them, see supra,

the Court also grants summary judgment in their favor on Count VIII.  See Raiche, 623 F.3d at 40.

With respect to the remaining Defendants—Letendre, Gonzalez, Healey, F. Laughran, Fitzpatrick, Macal, and Ricketts—the DOC Defendants argue that they acted in "good faith," and that common law immunity under Massachusetts law immunizes certain actions taken in "good faith."  [ECF No. 323 at 43–45].  The question of the good faith of the officers here, however, are pure questions of fact that the jury will decide after reviewing the evidence.  For example, the DOC Defendants cite to Foster v. McGrail, which was an opinion on a motion to alter or amend a judgment after jury trial.  844 F. Supp. 16, 18 (D. Mass. 1994).  In that case, as quoted by the DOC Defendants, a jury determined the officers acted in good faith.  [ECF No. 323 at 44–45].  Accordingly, the Court grants summary judgment on Count VIII with respect to Ryan, Santos, Merlino, Bull, Chaplin, and Walburn, and denies summary judgment on Count VIII as to Letendre, Gonzalez, Healey, F. Laughran, Fitzpatrick, Macal, and Ricketts.

### F.    Qualified Immunity

Finally, the DOC Defendants seek qualified immunity based on a four-sentence argument that, merely recites the standard and claims that qualified immunity applies "because the plaintiff has not made sufficient allegations of constitutional and civil rights violations by the DOC Defendants."  [ECF No. 323 at 61].  As explained above, however, for at least some claims Montrond has made sufficient allegations, supported by evidence considered for purposes of summary judgment, that the DOC Defendants violated his constitutional and civil rights.  See supra.  "Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play."  Alston v. Town of Brookline, 997 F.3d 23, 51 (1st Cir. 2021).  Here, DOC Defendants' cursory qualified immunity argument does not prove "the existence of circumstances sufficient to bring

35

the [qualified] immunity defense into play" on summary judgment.  Id.; see also Díaz-Colón v. Fuentes-Agostini, 786 F.3d 144, 149 & n.11 (1st Cir. 2015) (affirming denial of summary judgment motion asserting qualified immunity where defense was insufficiently argued below and not addressed on appeal).  Accordingly, the DOC Defendants' motion for summary judgment on qualified immunity is denied pending the development of a factual record at trial.

## IV.    CONCLUSION

Accordingly, the DOC Defendants' motion for summary judgment, [ECF No. 320], is GRANTED in part and DENIED in part.  It is granted with respect to Count I for Donahue only; Count VIII as to Ryan, Santos, Merlino, Bull, Chaplin, and Walburn; and Counts III, IV, V, and VII in their entirety.  It is denied with respect to Count I for Letendre, Gonzalez, Ricketts, Healey, F. Loughran, Macal, Fitzpatrick, Bressler, and Paone-Stuart; Count VI for Chaplin, Bull, Walburn, Bibeau, and S. Loughran; and Count VIII with respect to Letendre, Gonzalez, Healey, F. Laughran, Fitzpatrick, Macal, and Ricketts.

**SO ORDERED.**

March 14, 2024                                        /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE